This is 4090777, Lea Marie Yeagle v. Michael Huisinga and Gaila Hyslop. We have for the appellant, Edward Rawls and the apple leaf, James Jackson. May it please the court, counsel. We're here today as the court is aware from the briefs to, as appellant, to request the court to reverse the trial court, which granted the summary judgment in favor of one of the defendants and against the plaintiff. As we have submitted and stated in our briefs, as the court is reviewing the depositions, there are considerable disputes relative to facts that occurred in this, we refer to it as a collision between two all-terrain vehicles that were being operated on a county highway. And although the impact itself, what is referred to as a collision, was not a high energy impact between the two, it's basically a touching of a front wheel of the trailing vehicle to the rear wheel of the leading vehicle, which when vehicles of this nature are not meant to, like cars, have fenders for a reason. So that if you do, if they do come in contact and anyone who has seen stock car racing as opposed to open wheel racing or formula racing knows that things get real exciting when open wheel vehicles touch at any speed. That, in essence, was the nature of the so-called collision. But the pretty well undisputed facts are that two of these all-terrain vehicles were traveling and there's considerable dispute relative to speeds at different times. The defendant, who got out on the summary judgment motion, tells one version of the story relative to, in his discovery deposition, and he told the investigating officer the second day after the occurrence, another version. In the version, he tells the investigating officer they were traveling together. He was the leader of the group. They were traveling, he tells the officer, about 50 miles an hour and he realizes he has a passenger on his vehicle, he slows, slows down and moves toward the edge. There is contact between the two and the vehicle that my client was riding on, which was a trailing vehicle, goes catapulting down the road. Both occupants of the vehicle are tossed from the trailing ATV and my client ends up with a very severe permanent injury. The trial court, I think, was invited by the defendant in its motion for summary judgment to weigh the credibility and to accept the version that that defendant was advancing, saying, oh, we were only going 25 miles an hour, we weren't changing lanes, we didn't do anything suddenly, etc. To be frank, I was quite taken aback when the motion was granted because of the dispute in the factual situation. We took the discovery depositions of several teenagers and, as one would expect, there were overlapping, as there often are, overlapping recollections of certain things and then some that are diametrically opposed. And in the motion for summary judgment, an argument was made, unfortunately, we don't have the record. Fortunately, from our standpoint, we have a de novo review. The trial court, in granting the motion for summary judgment, had entered the order stating that he wanted the defendant, the successful movement, to write up a written order with findings or whatever. And when that was presented to me, I asked the court reporter for the transcript and then we were told, oh, there was apparently a malfunction of the Quiet County recording devices and we did not have a record of the arguments or the judge's explanation of his ruling. So, as the record indicates, I sent a letter requesting the trial court to please, could we reconvene, because of the malfunction, could we reconvene and have the trial court reiterate his ruling because there was an iteration of explanation for why he was ruling that took place the day we argued the motion and the day the motion was granted. But I wanted to try to have that memorialized so that we could come here and I could say, well, we disagree with this or we disagree with that. Or I asked in the alternative that he give a written opinion, which did not take place, neither. He just, we entered with an order that it was granted for the reasons argued in the defendant's motion for summary judgment. So, we're here to try to review everything. I believe that the evidence was contradictory, conflicting, as one would expect in this situation, but under the Federick summary judgment standard, they must be viewed in the aspect most favorable. So, I'm going to go to my client. How fast do these vehicles actually go? I'm sorry? How fast do these vehicles actually go? I think there was testimony in one of the, I think, in fact, the defendant, Mr. Hyslop, testified. I believe he said 70, 80 miles an hour. Top end. They have five, I think it's either a five or six speed transmission. And I believe Mr. Hyslop testified that they could be either 70 or 80 miles an hour. And these are those same vehicles that there are all these lawsuits over when people are injured? These open ATVs? Yes. There are two types of what they refer to. Sport ATVs and utility type ATVs, Your Honor. You will see the utility type of ATVs are typically those that are used for agricultural purposes that may have a basket for carrying capacity or tool boxes, etc. And then there are some that are referred to as sport vehicles that have very abbreviated. They have little fenders that sit upright above the wheels that are basically to prevent water and mud and stuff from being thrown on the operator. However, they're at such an elevation over the back of the rear wheel, rear wheels and the front wheels, that if the vehicles come in contact with one, tire to tire contact, it's possible that these vehicles get too close to one another. Do they actually race these vehicles? Oh, yes. These sport vehicles are raced competitively. They do stunts on them, wheelies. You'd be astonished. Typically young men with a lot of time on their hands spend a lot in adventure sports. You'd be surprised at what they can do if enough time is devoted on these to figuring out how to balance on the front wheels and rear wheels. So anyway, what appears at the trial court to have been argued and argued before this court is, and I think the appellee describes it as a rebuttable presumption that if there is a collision or a rear vehicle, trailing vehicle touches a preceding vehicle, that there's no liability possible relative to the preceding vehicle. Well, the cases that we have cited and both the plaintiff and the defendant have cited, specifically the Murnick case out of this court, talks about the fact that a preceding driver, and of course the case law is developed relative to automobiles, not these ATVs. These ATVs are specifically prohibited by the Motor Vehicle Code from being on the highways. But a preceding driver has a duty relative to if he's going to slow or stop. It is not a carte blanche situation where the preceding driver can just drive along and assume that everyone behind him has to look out for him. If that were the case, we wouldn't have rearview mirrors on cars. They're there for a reason. In this court, in 1957, and I'm assuming it's still good law, the Murnick case is good law, no one has argued the contrary, talks about the fact that the preceding driver does have duties relative to those people who are traveling behind so close as to constitute an immediate hazard. And as we hear from the testimony in this case, Christine Wilson, Mrs. Wilson, who happened to be a bystander as these kids went by on their vehicles moments before the crash, she says the two of them are traveling side by side in the middle of the road, one on one side of the middle, one on the other, and going at a speed that she thought was in excess of what's safe for that type of a road. And Mr. Hyslop, Richie Hyslop, tells the police officer two days later, well yeah, we're going about 50 miles an hour. Did he say something different in his deposition? Yeah, he said they never got over it. I think it was something in the 20s. His deposition testimony directly conflicts with what he told Sergeant Olson. And he tells Sergeant Olson two days afterward that yeah, he was slowing down because he realized he was going that fast and realized he had a passenger on, so thought he better slow down. And as he's moving, changing location on the roadway, moving to the side of the road, that's when he says he feels a bump and then looks over and sees the vehicle that my client had been riding on cartwheeling behind him. So I think basically reading the Murnick case and reading the depositions and the testimony in the aspect most favorable to my client, which is what is required under the Pedrick standard, of course I'm the advocate. I see no way that the trial judge should have granted a summary judgment. These are questions of credibility, questions of weight, the trier of fact should have made. Now one of the other aspects before the court is after the, before I get to that, I've gotten ahead of myself. One of the allegations that we make in the count two against Mr. Hyslop is that prior to his slowing that he failed to indicate to the vehicle behind him because he knew these vehicles were close behind him. The vehicle my client was on had been riding side by side at 50 miles an hour with him moments before this happened. He knew everybody was behind him. He was the leader. He said he always was the leader. So we've alleged that he failed to indicate that he was slowing. That's one of our specific allegations of negligence. There was no motion to strike that as not being a duty imposed by law, but there is no testimony that he ever did signal. So count two was a straight negligence count against Mr. Hyslop. That is the one that summary judgment was entered against. After the court had entered summary judgment on that, it was brought up, okay, well count three is an allegation of acting in concert under the Cole case. And the judge said, well, okay, since one of the defendants is out, and I've said that there's no way in the world a jury could find he did anything wrong, then Mr. Husingay, who's the defendant under count one, could not have been acting in concert with someone who did nothing wrong. So therefore, even though I don't think the motion requested summary judgment on that, the court granted it and said, well, count three is thrown out also. So the relief we are requesting of this court is that the trial court be reversed on the orders that it entered and counts two and three be reinstated. The count three, the acting in concert, was pursuant to the law of Illinois, which is adopted, restatement 876 sub A. The argument has been made by the defendant that, well, there wasn't a common design on sub A. I think I made that clear in our reply brief that we are proceeding under the first half of subsection A. Subsection A of 876 says if someone acts in concert or pursuant to a common design. Now, we're conceding no. We are not alleging, even though the defendant says, well, there was no evidence of a common design. We're saying they're acting in concert, the first half of sub A. And because of the fact that we have the uncontroverted testimony, all these kids were traveling together. They had been traveling together much of the afternoon until my client and the other young lady who was on Mr. Hyslop's vehicle, Ms. Camacho, arrived. And then they decide to go off the Hyslop property and the defendant, Hyslop, takes them out onto what was old Route 47 that is closed now, but then over what's called Bucks Pond Road over the top of Interstate 72 onto a county road that, once again, is area that the defendant, Hyslop, says and he admits he knows it is illegal to operate these vehicles on a public highway. The accident didn't happen on the public highway? Pardon me? The accident didn't happen on the public highway, correct? Yes, it did. A county road is a public highway. Yes, this accident happened on, and the police report gives the designation exactly of where it was. I can't remember the site. One is County Road 1650. It's in the police report. Yes, and that's why both of them were ticketed for operating the vehicles on a county highway. The only way, is my understanding of the Motor Vehicle Code, Your Honor, is the only way you can operate these vehicles on a highway is perpendicular across. You can cross the highway to get from one piece of private property to another, but you can't drive them on the highway, on a public highway, and you cannot drive them like in the ditch, parallel to. Driving the vehicle on the public highway, was that approximate cause of the accident? It was approximate cause in the sense, Your Honor, if they hadn't have been operating it on that, the two of them, it never would have happened there. One of the reasons kids like to operate these things on the highway is you can go 60, 70, 80 miles an hour on a hard road. You can't do that across an agricultural field, a bean field or a corn field. You'll tear the vehicle up, shake your brains out, and probably end up, you know, that'll happen if you're going about 30 or 40. But that's one of the reasons kids and people like to operate them on there, because you get on the hard road, and then you can operate them at that speed. But no, it is, there's no question, there's no argument made that operating them where the accident occurred was not in a location that was prohibited by the statute. So the relief we're requesting before the court is that Judge Fries be reversed and the case be remanded in order to reinstate both counts two and count three, the acting in concert. Is Judge Schumpweiler still a judge over there? He certainly is, yes. He was substituted. One of the other defendants filed a motion to substitute. Husing gave, filed a motion to substitute away from Judge Schumpweiler and it was assigned to Judge Fries. Yeah, Judge Schumpweiler is the presiding judge in Hyatt County as well as the chief judge of our district. Thank you, counsel. Thank you. Mr. Jackson. Good morning, your honors. May it please the court, counsel. I apologize for my crackly throat. I've been fighting a cold, so I'll battle through it. The appellate talks as if the trial judge was asleep at the switch in granting summary judgment for the co-defendant, Richie Hyslop. I submit to the court that the judge clearly was not asleep at the switch, but that this case, the facts are so straightforward that a summary judgment was the appropriate decision to make. This case, conceptually, is very easy to understand. Two four-wheelers leave the Hyslop residence. They are out on the road for, I think there was probably 10 or 15 minutes between the time they left and the time the collision occurred. And it's a two-vehicle collision with the trailing vehicle running into the front vehicle, the Hyslop vehicle. It was a rear-ender. When the Huesengate, the back vehicle, runs into the Hyslop four-wheeler, the Huesengate four-wheeler cartwheels and the girl that was on the back of the Huesengate vehicle gets hurt. That's pretty conceptually easy to understand. Michael Huesengate, the driver of the four-wheeler that ran into Hyslop, says under oath, at his deposition, when he was asked, so the collision occurred because you couldn't get slowed down in time. And he said, yeah, that's what happened. And were you driving too fast for the conditions? Is that what caused it? Yeah. He was driving too fast for the conditions. Then he was asked, was there anything that Mr. Hyslop, Richie Hyslop, did to quote-unquote cause you to run into him? And he said, no. That's the gentleman that was driving the back vehicle. He said, I was driving too fast, Hyslop didn't do anything to cause it, and it happened. Now, the investigating officer issued a citation to the back driver for aggravated reckless driving after conducting his own investigation, to which Huesengate eventually pled guilty to driving too fast for conditions. That's the fundamental set of facts which warrants what the trial court did here. You've got a back four-wheeler running into the front four-wheeler, and the guy who's on the back four-wheeler says, I was driving too fast, I couldn't stop, I couldn't get out of the way, and there was nothing that Hyslop did to cause this to happen. And what was your client ticketed for? For the improper use of an ATV vehicle on a public roadway. So nothing to do with the accident? I'm sorry? Nothing to do with the accident? Nothing. That was it. Both boys got ticketed for that. The Huesengate, the back vehicle, was ticketed for the aggravated reckless driving. Well, my question is, didn't your client give a statement to the police officer that he knew he had a passenger, moved to the side, was traveling at 50 miles an hour? Yeah, his testimony at the deposition was, at the time of the collision, he was going 28 miles per hour. When he had talked to the police officer, and he had testified at his deposition that prior to that point in time, they had gotten up to about 50 miles an hour. Between the time they left his parents' home and the point of the collision. But with the police officer, he said, yeah, earlier in the trip we were going 50 miles an hour, and then at the time of the collision, I had slowed down, he didn't give a specific speed, but he had slowed down. And pulled over. And moved closer to the side of the road. That's what he had told the police officer. His testimony at his deposition is not inconsistent with that. He said under oath at the deposition, we were going about 50, 55 miles an hour earlier in the track and earlier in the trip. Then we got up to Lodge Park, which is right, there's a back entrance to that on Bucks Pond Road. We, meaning he and a couple of other drivers who were part of this group of boys, pulled over to Lodge Park, just to pull over real quick and figure out where are we going to go from here. And he starts to accelerate from Lodge Park, and by the time the collision occurs, he's at 30 miles an hour. That's his deposition testimony. The full story. But the critical facts of this are that at the time that the collision occurred, he was going about 28, according to another witness, he had estimated he was going 30 miles per hour. 28 to 30 miles per hour. And nobody disputes that. And then, here comes Michael Huesenga, crashes into him, and his vehicle goes flip. Flipping down the road about 20 yards. Those are the facts. The only way that a lead vehicle is responsible or liable in Illinois, is if you have the responsibility to have working brake lights and not stop or slow suddenly. That's what a lead vehicle is responsible for in Illinois. The trailing vehicle is the one that carries the bulk of the responsibility, for good reason. It's the trailing vehicle that's got his vision on the lead vehicle. There's no testimony here that Richie Hyslop had brake lights that weren't working. They were. They did not go on when this collision occurred. He wasn't jamming on his brakes. The brake lights were not on. Nobody says they were. The plaintiff herself says, no, I didn't see any brake lights. So if he's not got any brake lights on, he's not jamming on those brakes. So there's no testimony that he had stopped, that he had unworking brake lights. The only thing that the plaintiff can rest her head on is saying he slowed down suddenly. And yet nowhere in the deposition testimony does anybody say that. The most that the plaintiff herself says, and remember she is the passenger on the trailing vehicle, and she acknowledges that the driver who's sitting immediately in front of her is taller than she is. She can't see over his head. The only way she looks is look and lean one side or the other of him. She says, all I remember is we were coming up on high slope. I didn't see any of his brake lights. Michael, that was the vehicle's driver she was on, he swerved. And then she doesn't remember anything else. She says, well, what I remember is that the high slope vehicle kind of slowed down kind of fast. Later on, right after that in her deposition, she was asked, well how fast was the Hughes and Gay vehicle and the high slope vehicle going before the collision occurred? I have no idea. How fast were the vehicles going at the time the collision occurred? I don't have any idea. You don't know how fast the high slope vehicle was going at the time of the collision? No. Would it be a pure guess then as to how fast high slope was traveling? Yeah, it would be a pure guess. Well, is your memory from that pretty fuzzy? Yeah, it is. Then she was asked, well, is it possible that the high slope vehicle only appeared to you to be slowing down because the vehicle you were on was going so fast? Yeah, I suppose that's possible. Then she was asked, do you agree with Michael Hughes and Gay's testimony when he said the reason for the collision was because he was driving too fast? Yeah, I agree with that. Do you agree with Hughes and Gay's deposition when Hughes and Gay denied any fault on the part of high slope? And all the plaintiff says is, I don't know. That's the only testimony here regarding high slope that the plaintiff can even remotely say points to high slope as a culprit in this. That's it. He had working brake lights. They didn't come on. He hadn't stopped in the roadway. All they can say is now, they're trying to say in their brief, everybody says they stopped or slowed down suddenly. There is no testimony to that. The most that can be said, based on all of the occurrence witnesses, and we have all of that now, the most that can be said is the plaintiff, according to her, she says, he appeared to kind of, it kind of looked like he kind of slowed down. That's all there is. That's not enough to say that. I thought Justin Foran testified that when they were talking about stopping outside Lodge Park, that Jake Dunn slowed down and stopped, then Foran stopped, then high slope stopped. Yeah. And they were waiting for, they had, there were three other vehicles. And they were spread out over a span of distance. And they just pulled over to Lodge Park and stopped. Didn't Husingate say he never stopped at the parking lot? Husingate doesn't remember it. And then when he was asked in his deposition, is it possible that she did and you don't remember it, yeah, it is possible. He just doesn't remember it. And his passenger didn't remember stopping at the parking lot. She doesn't remember it. Isn't there a difference between some of the cases that talk about these vehicles, when here in this situation what you have are the two ATVs that are traveling in close proximity to each other on purpose down this road, right? Because when Mrs. Wilson testified, she was backing out of the driveway or some of the cars, they backed out. She saw them taking up the whole road. They were in close proximity to each other. She said that road barely holds two cars across the lane. And that was hilly and had blind curves. And they were traveling side by side, right? That's what she said, yes. At some distance prior to the actual collision site. Right, but she made it to the collision site from her house within a minute or a little over a minute. That's what she estimated, about a minute. Well, it was only a quarter mile from her house. Right, and she said she drove about 15 miles an hour. Actually, it would take about three minutes, two or three minutes to get there. That was her testimony, yeah. But there is no testimony. So in other words, what I'm saying to you is, doesn't a driver on an ATV under those circumstances have an obligation to keep a lookout for this other party that's driving like they are? Because you don't know where he is. You were very close together for almost the entire trip. Well, that's not the facts. That was what Christine Wilson said at that point, about a mile. During that period of time that she looked back and saw them coming from up the hill, they were driving side by side. Right, but nobody testifies that they were driving side by side at the time. I understand that. But that's the critical time, is at the time of the collision. And there's no testimony that High Slope stopped. There's no testimony that he had improper brake lights. And there's no testimony that he stopped or slowed suddenly. And if that's the case, there's no negligence on his part. And the driver who ran into him says, I was driving too fast. Did High Slope do anything to cause the collision? No. I mean, he was treading Mr. Huizinga. I mean, he said, I was driving too fast. And he pled guilty to driving too fast. It's because of the factual simplicity of this case that the judge granted the summary judgment. We have all of the deposition testimony in the record. All the occurrence witnesses. You know, anything about this has been deposed. The trial court had all of that before him. And the law says that if we've got all the deposition testimony, all the testimony that would be presented at trial, and if all of that testimony would be presented at trial, and that would require the directing of a verdict based on all of that, then the summary judgment is appropriate. And that's what we have here, because there's not any evidence that High Slope did anything wrong. That's what the case is about. Did he do anything wrong to cause the collision? No. And I want to reiterate to the court that the appellant says in his brief that both Huizinga and Yagle, the plaintiff, testified in their deposition that High Slope slowed down suddenly. That is not true. That is not true. The most that Yagle said was he kind of slowed down, kind of fast at one point, and fairly quickly at another point. But right after that, admitted she didn't have any idea how fast he was going at any point on the trip, and she acknowledged that it may have only appeared that he had slowed down because Huizinga was driving so fast. The appellant has argued that this case involves an acting in concert situation. But this court's recent opinion in the Norman v. Brandt case, I think, puts to rest that that's really the case here. I mean, in the Norman case, you had a lead vehicle that was speeding, and was sued by the injured passenger of the trailing vehicle, and accused of acting in concert with the driver of the rear vehicle. That's exactly what we've got here. In Norman, you had the lead vehicle that was, I think by all rights, speeding at the time. There's not any indication that High Slope was speeding at the time. But this court acknowledged that the front vehicle and the back vehicle did not have an agreement to commit a tortious act. They weren't racing down the roadway, passing each other back and forth. They hadn't said, let's race or let's fly down the road. There was nothing to support an in concert claim against the lead vehicle. Same thing applies here. There's no evidence that there was any plan or agreement between High Slope or Husingate to commit a tortious act. Certainly, High Slope would not be party to any agreement or plan to drive in a way where he was going to get rammed from behind. There's no evidence of that. The investigating officer asked all of these people whether they had been racing and they all said no. And there's no testimony given at the depositions to indicate that these kids were racing. They were simply out driving from the High Slope residence out on the county road. And the road that connects the High Slope residence on which they were traveling does hook up with other land that the kids would often ride on, private property, where they could drive their ATVs. That's the rest of the story about why they were traveling out there. But I think in summary that the trial judge had summary judgment because the case is so simple. It's a rear end collision. The rear driver says I drove too fast. Nothing about what High Slope did caused this. It's my fault. And there's no testimony that High Slope stopped. There's no testimony that his brake lights weren't working. And all that the plaintiff says is at one point he kind of slowed down, kind of fast. But then acknowledges maybe not. Thank you. Unless there are any questions, I think my time is up. Okay. Rebuttal. I have to politely dispute representations that were made to the court by my opponent. I believe Justice Myers asked relative to what Mr. High Slope related to the two days after, his rendition of the occurrence and speed to what it was months later when he's giving a discovery deposition. And I believe, and your record is more accurate than mine, you can check the transcript. But I believe he indicated that at the time of his High Slope's representation of what happened in speed to the officer, that he said, oh, at the time of the collision it was 20 some miles an hour. There's no such thing. If you read in page 5, and I don't have his deposition, but page 5 of the supplement to the police officer's report, Olson says that I asked Mr. High Slope to tell me what happened. He stated that they were riding ATVs and they decided to go out for a ride. He stated that they were traveling north on Bucks Pond Road. He stated that he thought they were going around 50 miles an hour. He stated that he realized he had a driver on back and slowed down. He stated that he looked over his left shoulder to see where Huizinga was as he moved into the ditch. He stated that he did not see the other ATV and then felt something run into the back of him. He stated that he saw the other ATV flip over several times and stopped his vehicle and went. He stated that he moved his ATV after he was going. There's no statement to the effect that, oh, we may have been going 50 miles an hour prior to this occurrence, but then at the time it was 20 some miles an hour. No, I believe that if that was the representation, I think it was a misrepresentation. So I would invite the court to reread the officer's report. Mr. Jackson makes much of, well, he didn't stop. There was no stop. Well, the Mernick case decided by this court states specifically, a sudden slowing may easily have the same elements of danger as a sudden stop, and both come under the same principle of law. Generally, a motorist intending to stop or suddenly slow down his vehicle must use due care for his safety and the safety of others following, such as vehicles following so close behind as they might be imperiled by a sudden stop. A sudden slowing may amount to a practical stop as to require precaution. Is there a sudden slowing here? Is there any evidence of a sudden slowing? Yes, my client said that she's rapidly. And I was looking, trying to find, Husingay says basically the same thing. Of course, when two vehicles, when one vehicle is traveling so close, immediately behind, which is what Husingay said, they were immediately behind, that you don't have to slow, you don't have to get to the brakes. All you have to do is let out of the throttle and the vehicle will slow. Are there any cases where it is not braking, it's simply a slowing of one of these vehicles with the throttle? As far as applying brakes? Versus. Of course, we must keep in mind, Your Honor, I don't believe these vehicles are entitled to the rules of the road. The rules of the road of Illinois are you can't operate these kind of vehicles on the highway. They don't have rearview mirrors. They don't have fenders. There's a reason they are prohibited. So to say, well, okay, this is a very simple case. Just like any other traffic, garden variety traffic collision, two licensed vehicles properly on the road is wrong. Because of the nature of these vehicles, they are not like regular vehicles. Am I wrong in thinking that the evidence shows that Hyslop not only slowed, he pulled over in front of? That's exactly what happened. And that's exactly what Husingay says happened. That as he's slowing down, he realized he's so close behind him that Husingay can't even swerve to miss him. They're traveling right behind one another. So did he swerve to get out of the way? He swerved to try to miss him. As Hyslop is coming over to the left, as he tells Sergeant Olson, he's moving over toward the ditch, and he moves right into Husingay's path. And Husingay tries to swerve around him, and they touch wheels. And the trailing vehicle goes catapulting. So no stopping. And the semantics of, oh, did he stop quickly? Did he stop suddenly? But one of the things we may have lost sight of is that the evidence at this stage has to be viewed in its aspect most favorable to my client. I listen as Mr. Jackson says, oh, well, she says later that she may be mistaken or not. He's arguing credibility or weight. That's for the jury to decide when hearing all the evidence of the juxtaposition of how these two vehicles were traveling and the fact that there's no testimony that Hyslop indicated that he was going to slow, and he knew, as Your Honor, Justice Myertkoff mentioned, these vehicles traveling in such proximity and, Justice Bokas, you say, yeah, moments before the collision, they're traveling side by side in the middle of the road, traveling both sides of the road. And as Mrs. Wilson testified, the vehicle that my client was on was the only one that was on the right side of the road. She said that the Hyslop vehicle was actually traveling north in the left-hand side of the road. But, of course, once again, these vehicles had no business being on the road. So there's enough dispute of facts, dispute of testimony. Huizinga's testimony, oh, yeah, I maybe think I'm the only one at fault. That doesn't bind a jury. One co-defendant can't exonerate another and say, oh, yeah, it was all my fault, even if he did. That's up to the trier of fact. We never got to the trier of fact. We had a right to. Thank you, counsel. We'll take this matter under advisement and resets for the meeting. Thank you. Jim, we'll see you later. Edward, drive safely. Take care. Take care. Thank you. All right. Goodbye. Have a good day. How many more do you have yet today? Just one more. One more? Yeah. Thank you. Thank you. Thank you.